UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X
JEAN HERARD,

Plaintiff,

-against-

JAPAN VILLAGE INC. d/b/a Japan Village, Panya and JTunes; LOVE FIELD INC. d/b/a Sunrise Mart Brooklyn and WakuWaku x Oldies; SUNRISE MART INC. d/b/a Sunrise Mart Midtown; IDI PROJECTS INC. d/b/a Sunrise Mart SoHo; TADAO YOSHIDA; and TAKUYA YOSHIDA,

Defendants.
---------------------------------------------------------X

LUIS XAVIER FLORES CARRERA,

Plaintiff,

-against-

LOVE FIELD INC. d/b/a Sunrise Mart; LOVE FIELD INC. d/b/a WakuWaku a/k/a WakuWaku + Oldies; JAPAN VILLAGE INC. d/b/a Japan Village, Panya and JTunes; SUNRISE MART INC. d/b/a Sunrise Mart Midtown; IDI PROJECTS INC. d/b/a Sunrise Mart SoHo; TADAO YOSHIDA; and TAKUYA YOSHIDA,

Defendants.
---------------------------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**
26-CV-0123 (DLI) (TAM)
26-CV-0843 (DLI) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

These two cases allege separate violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL"), Art. 6 § 190 *et seq.* and Art. 19 § 650 *et seq.*, against Defendants, who own and/or operate a group of

"Japanese-themed businesses," including a food hall and event space, bakery, restaurant, and multiple supermarkets and bars. Mem., ECF 52-1, in *Herard v. Japan Village Inc., et al.*, No. 26-CV-0123 (DLI) (TAM) (hereinafter "*Herard*"); *see generally* Compl., ECF 1, in *Herard*; Compl., ECF 1, in *Flores Carrera v. Love Field Inc., et al.*, No. 26-CV-0843 (DLI) (TAM) (hereinafter "*Carrera*").[1]

Currently before the Court are Plaintiffs' motions for conditional collective action certification under the FLSA, which Defendants oppose. *See* Mot. to Certify FLSA Collective Action ("Herard Mot."), ECF 52, in *Herard*; Mot. to Certify FLSA Collective Action ("Carrera Mot."), ECF 40, in *Carrera*. For the reasons discussed below, the Court grants Plaintiffs' motions.[2]

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On January 9, 2026, Plaintiff Jean Herard ("Herard"), individually and on behalf of all others similarly situated, initiated a lawsuit, alleging that Defendants Japan Village Inc. ("Japan Village"), Love Field Inc. ("Love Field"), Sunrise Mart Inc. ("Sunrise Mart"), and IDI Projects Inc. ("IDI Projects") (collectively, the "Corporate Defendants") misclassify employees who are paid a flat daily rate as exempt from overtime compensation under the FLSA. *See generally* Compl., ECF 1; *see also* Am. Compl., ECF 21, ¶¶ 2–3, in *Herard*. On February 12, 2026, Plaintiff Luis Xavier Flores Carrera ("Carrera"), individually and on behalf of all others similarly situated, initiated a separate lawsuit,

---

[1] Although both Herard and Carerra are represented by the same counsel and bring related claims against the same Defendants, the cases allege different violations of the FLSA, and therefore have not been consolidated. That said, the Court considers the motions together in the interest of judicial efficiency.

[2] It is well settled that a magistrate judge has authority to decide a motion for certification of a collective action. *See, e.g.*, *Gonzalez v. Wicked Taco LLC*, 764 F. Supp. 3d 77, 89 n.3 (E.D.N.Y. 2025) (collecting cases); *Summa v. Hofstra Univ.*, 715 F. Supp. 2d 378, 383–84 (E.D.N.Y. 2010).

alleging that the Corporate Defendants engaged in unlawful tip credit and tip-pooling practices as to certain of their hourly workers, in violation of the FLSA. *See generally* Compl., ECF 1; *see also* Am. Compl., ECF 15, ¶¶ 11–12, 24–25, in *Carrera.*

The Court first recites the factual background relevant to both cases, then summarizes the factual background relevant to each case individually. The Court then discusses the procedural history of both cases.

## I. Factual Background

As relevant to both cases, Plaintiffs allege that Defendants Tadao Yoshida ("Tadao") and Takuya Yoshida ("Takuya") (together, the "Individual Defendants") have served as the Chief Executive Officer and/or Chief Operating Officer of the Corporate Defendants and have owned and operated the same. Am. Compl., ECF 21, ¶¶ 52–80, in *Herard*; Am. Compl., ECF 15, ¶¶ 85–109, in *Carrera*. The Corporate Defendants own and operate businesses in the hospitality and/or food service industries. Specifically, Defendant Japan Village "operates a Japanese-themed food hall by that name, a bakery named Panya ('Panya'), and a karaoke bar named JTunes ('JTunes')." Am. Compl., ECF 21, ¶ 1, in *Herard*; *see* Am. Compl., ECF 15, ¶ 8, in *Carrera*. Defendant Japan Village also does business as "Sunrise Mart." Am. Compl., ECF 21, ¶ 28, in *Herard*; *see* Am. Compl., ECF 15, ¶ 8, in *Carrera*. Defendant Love Field operates Sunrise Mart Brooklyn, a specialty supermarket selling Japanese food, groceries, and merchandise, and WakuWaku, a/k/a WakuWaku + Oldies, a Japanese restaurant (WakuWaku) and cocktail bar (Oldies) in Brooklyn, New York. Am. Compl., ECF 21, ¶ 34, in *Herard*; *see* Am. Compl., ECF 15, ¶¶ 4–5, in *Carrera*. Japan Village, Panya, JTunes, Sunrise Mart Brooklyn, as well as a sushi bar called Sushi Uesugi operated by Japan Village, are all located on the same premises, in the Industry City complex in Brooklyn, New York. *See, e.g.*, Am. Compl., ECF 15, ¶¶ 8–9; Mem., ECF 40-1, at 3; Cheng

Decl., ECF 40-4, ¶ 3, in *Carrera*. Defendant Sunrise Mart operates Sunrise Mart Midtown, a specialty supermarket similar to Sunrise Mart Brooklyn, located in Midtown Manhattan, while Defendant IDI Projects operates Sunrise Mart Soho, a similar supermarket in SoHo. *See* Am. Compl., ECF 21, ¶¶ 40, 46, in *Herard*; Am. Compl., ECF 15, ¶¶ 6, 7, in *Carrera*.

Plaintiffs are former employees of Defendants. Am. Compl., ECF 21, ¶ 14, in *Herard*; Am. Compl., ECF 15, ¶ 41, in *Carrera*. Plaintiffs allege the Corporate Defendants operate as a single enterprise controlled by the Individual Defendants, and the Individual Defendants are joint employers of Plaintiffs. *See* Am. Compl., ECF 21, ¶¶ 15, 80–86, 87–92, in *Herard*; Am. Compl., ECF 15, ¶¶ 115–120, in *Carrera*.

**A. *Herard***

From March 10, 2023, through December 4, 2025, Plaintiff Herard was employed by Defendant Japan Village "and its owners" as a Human Resources ("HR") Coordinator. Am. Compl., ECF 21, ¶¶ 14, 95, in *Herard*. He alleges that he was hired to handle Japan Village's HR functions, but he was later tasked with performing general operational duties for each of the businesses operated by the Corporate Defendants. *Id.* ¶ 15. Herard alleges that his responsibilities included "onboarding paperwork, administrative follow-up and related work, data entry, event planning, logistics, design work, vendor management, food service staffing functions, physically assisting with events, staffing logistics, and vendor setup, . . . payroll follow-up, and compliance/admin tasks." *Id.* ¶ 17. He further avers that he "travel[ed] between locations to handle operational problems." *Id.*

Per the amended complaint, "[w]hile Herard could relay management decisions, at no time was Herard ever vested with the independent discretion to retain, supervise or terminate employees, make employee pay decisions, or handle employee scheduling

matters." *Id.* ¶ 18; *see id.* ¶¶ 19–20 (noting that Tadao and Takuya handled "[a]ll true managerial decisions"), 90 (identifying general manager Kai Ebihara as an individual among "other designated managers" who performed management functions such as hiring and firing employees, supervising work schedules and responsibilities, modifying terms and conditions of employment, and determining employees' rates and methods of compensation).

Herard alleges that he was hired as a "day rate employee," meaning he was "paid a day rate for his services, regardless of the number of hours actually worked." *Id.* ¶¶ 14, 22 (capitalization modified). He claims he "routinely worked in excess of 40 hours per week, oftentimes performing work well into the evening and on weekends," but "was never compensated for his extra hours, much less paid overtime for those extra hours." *Id.* ¶ 23. He alleges that he was only ever paid "at his flat daily rate." *Id.* ¶ 24; *see id.* ¶ 97 (noting that if Herard "worked four days he was paid for four, and if he worked six days he was paid six, all at the same daily rate"); *see also* Herard Reply Decl., ECF 56, ¶ 9 (stating that Herard was paid $277 per day), in *Herard*. He further alleges that Defendants misclassify day rate employees like himself as exempt from overtime, in violation of the FLSA. Am. Compl., ECF 21, ¶¶ 3, 4, in *Herard*.

Herard also alleges that he repeatedly raised concerns to Defendants about the above pay practices as applied to himself and other employees over the course of his employment. *Id.* ¶ 134. On December 1, 2025, Plaintiff consulted counsel about these practices, and on December 4, 2025, he "contacted a handful of former employees by email regarding the pay practices and their rights under the FLSA and NYLL." *Id.* ¶¶ 135–36. That same day, December 4, 2025, Plaintiff was terminated by Defendants. *Id.* ¶ 138. Although not relevant to the collective action certification motion, Plaintiff alleges that Defendants retaliated against him under the FLSA and NYLL. *Id.* ¶ 133.

Plaintiff alleges that other employees who were subject to the same pay practices (*i.e.*, paid a daily rate regardless of the number of hours worked and not paid overtime for hours worked in excess of 40 per week) "include workers employed as cooks, food preparation workers, floor staff, restaurant hosts, and retail store 'managers'" (collectively, the "Day Rate Employees"). *Id.* ¶ 3. He sues on behalf of "[a]ll employees who are or have been employed by Defendants as Day Rate Employees at any point during the Collective Period," *i.e.*, the three-year period prior to the filing date of this action through the entry of judgment, "and who earned and were not paid lawful overtime premiums under the FLSA pursuant to the policies and practices applicable to the Collective identified herein." *Id.* ¶¶ 5, 93. There are approximately 48 such individuals. *Id.* ¶ 94.

**B. *Carrera***

Plaintiff Carrera was employed by Defendants as a server at WakuWaku from March 2021 through April 22, 2026. Am. Compl., ECF 15, ¶ 41; *see* Carrera Decl., ECF 40-3, ¶ 2 (noting that Carrera was terminated on April 22, 2026), in *Carrera*. He was paid "a sub-minimum cash wage" on an hourly basis, classified as a tipped employee, and was required to participate in a mandatory tip pool, as were other tipped employees like bussers and cashiers. Am. Compl., ECF 15, ¶ 41; *see id.* ¶¶ 11–12, in *Carrera*. Carrera alleges that Love Field and the Individual Defendants "purported to avail themselves of a 'tip credit' toward their minimum wage obligations" under the FLSA and NYLL, but that Carrera was never provided with notice of such tip credit at all, let alone in his native language of Spanish. *Id.* ¶¶ 12–13.

The tip-pooling arrangement worked as follows: Five percent of all tips earned by servers were distributed to kitchen employees, and an additional ten percent of all tips earned by servers were distributed to bar staff who did not participate in the tip

pool. *Id.* ¶¶ 14, 48–49. Carrera alleges that "[t]he remaining eighty-five percent (85%) of servers' tips were redistributed among servers based on an unlawful and arbitrary performance-based formula dictated by" Love Field and the Individual Defendants. *Id.* ¶¶ 15, 55; *see id.* ¶ 2. According to a "Tipping Policy Quick Guide" that was provided to Carrera and other servers, tipped employees' share of the tip pool was based on their performance, which was evaluated "each pay period." *Id.* ¶ 16. Per the guide, higher performance scores would lead to a "higher share of tips." *Id.* Plaintiff alleges that "management and supervisory personnel also shared in tips left by customers for Carrera and other" tipped employees. *Id.* ¶¶ 20, 54.

Carrera alleges that he did not consistently receive statements explaining how his tips were calculated, preventing him from determining whether his tips were pooled lawfully. *Id.* ¶¶ 51–53. He further states that because Defendant Love Field and the Individual Defendants failed to provide proper tip credit notice and operated an unlawful tip pool, they were not eligible to take a tip credit, and as a result, he and similarly situated workers were not paid the minimum wage as required by the FLSA and NYLL. *Id.* ¶¶ 56–57. He further states that because his employer was not eligible to pay him a subminimum wage, his overtime rate was improperly calculated, and he was underpaid for hours he worked over 40 in a given workweek. *Id.* ¶¶ 137–38, 145–49.

Carrera brings claims on behalf of similarly situated workers at WakuWaku and Defendants' other entities. Per the amended complaint, restaurant workers, baristas, retail employees and cashiers who work at Japan Village and Sunrise Mart Brooklyn are

also compensated on an hourly basis and receive tips.[3] *Id.* ¶ 23. These workers are also subject to mandatory tip pooling: tips are collected at both locations, "such that workers manning food stalls in Japan Village were sharing their tips with workers in the Sunrise Mart Brooklyn supermarket and vice versa." *Id.* ¶ 24. As with the tip-pooling arrangement at WakuWaku, Japan Village, Sunrise Mart Brooklyn and the Individual Defendants "exercised unilateral discretion to increase or decrease participants' share of pooled tips based on their subjective assessments of a worker's performance and for purported disciplinary reasons." *Id.* ¶ 26. Additionally, "management and supervisory personnel also shared in tips left by customers" for employees of these Defendants. *Id.* ¶ 27.

As alleged in the amended complaint, baristas, retail employees and cashiers who work at Panya, Sunrise Mart Midtown, and Sunrise Mart SoHo are also hourly workers subject to a mandatory tip-pooling arrangement. *Id.* ¶¶ 30–32. This arrangement "collected the tips employees received and distributed a portion of those tips to back-of-house staff who had no customer interaction," *i.e.*, were tip-ineligible. *Id.* ¶ 32. As with the two above tip-pooling arrangements, Japan Village, Sunrise Mart, IDI Projects, and the Individual Defendants changed workers' share of pooled tips based on discretionary assessments of workers' performance or for disciplinary reasons, and management and supervisory personnel shared in tips left for these employees. *Id.* ¶¶ 34–35.

---

[3] The Court notes that the amended complaint alleges that these workers were "paid at least the minimum wage and not subject to a tip credit." Am. Compl., ECF 15, at 8 n.1, in *Carrera*. However, declarations submitted by opt-in Plaintiffs Manyi (Melody) Cheng and Emily Valencia, who worked at Japan Village and Sunrise Mart Brooklyn, aver that these Plaintiffs were paid a subminimum wage plus tips while working at Sushi Uesugi. *See* Cheng Decl., ECF 40-4, ¶ 8; Valencia Decl., ECF 40-5, ¶ 9, in *Carrera*.

Carrera's complaint proposes three collectives of workers whom he alleges are similarly situated to him:

First, the "WW Tipped Employee Collective" would consist of "[a]ll current and former non-exempt [WakuWaku] Tipped Employees who," during the Collective Period, "were employed by the WW Defendants, participated in a mandatory Tip Pool that included employees ineligible to receive tips and/or management, and who, as a result of Defendants' policies and practices, were deprived of tips, minimum wages, and/or overtime compensation to which they were otherwise entitled under the FLSA." *Id.* ¶ 121; *see id.* ¶ 21; *see also id.* ¶ 12 (defining "WW Defendants" as "WakuWaku and the Individual Defendants").

Second, the "JV-B Tipped Employee Collective" would consist of "[a]ll current and former non-exempt JV-B Tipped Employees who," during the Collective Period, "were employed by the JV-B Defendants, participated in a mandatory Tip Pool that pooled together the tips of both entities (Japan Village and Sunrise Mart Brooklyn), included employees ineligible to receive tips and/or management, and who, as a result of Defendants' policies and practices, were deprived of tips to which they were otherwise entitled under the FLSA." *Id.* ¶ 121; *see id.* ¶ 28; *see also id.* ¶ 23 (defining "JV-B Defendants" as Japan Village, Sunrise Mart Brooklyn, and the Individual Defendants," and the "JV-B Tipped Employees" as hourly tipped employees of the above Defendants).

Third, the "P-M-SH Tipped Employee Collective" would consist of "[a]ll current and former non-exempt P-M-SH Tipped Employees who," during the Collective Period, "were employed by the P-M-SH Defendants, participated in a mandatory Tip Pool that included employees ineligible to receive tips and/or management, and who, as a result of Defendants' policies and practices, were deprived of tips to which they were

otherwise entitled under the FLSA." *Id.* ¶ 121; *see id.* ¶ 36; *see also id.* ¶¶ 30–31 (defining "P-M-SH Defendants" as Panya, Sunrise Mart Midtown, Sunrise Mart Soho, and the Individual Defendants and the "P-M-SH Tipped Employees" as hourly tipped employees of the above Defendants).

**II. Procedural History**

As noted above, Plaintiff Herard filed his lawsuit on January 9, 2026, and Plaintiff Carrera filed his on February 12, 2026. *See generally* Compl., ECF 1, in *Herard*; Compl., ECF 1, in *Carrera*. Herard's initial complaint named only Japan Village, Tadao, and Takuya as defendants, while Carrera's initial complaint named only Love Field, Tadao, and Takuya. *See generally* Compl., ECF 1, in *Herard*; Compl., ECF 1, in *Carrera*. After Plaintiffs filed waivers of service returned executed, the Court scheduled an initial conference in both cases for April 23, 2026. *See, e.g.*, Mar. 2, 2026 ECF Scheduling Order, in *Herard*. On March 19, 2026, the parties filed stipulations, indicating that the parties agreed that (1) Plaintiffs could amend their respective complaints to add all Defendants; (2) Defendants agreed to accept service; and (3) a 60-day deadline for Defendants' response should be set. *See, e.g.*, Stip., ECF 20, in *Herard*.

On April 23, 2026, the Court held an initial conference in both cases. *See, e.g.*, Apr. 23, 2026 ECF Min. Entry & Order, in *Herard*. The Court set a coordinated discovery schedule across both matters, and discussion was held regarding the instant collective

action certification motion.[4] *Id.* The Court advised the parties to initiate the motion practice by filing a letter with a proposed briefing schedule, which the parties did on May 19, 2026. *See, e.g.*, *id.*; Letter, ECF 40; May 20, 2026 ECF Order, in *Herard*. On May 22, 2026, in accordance with the deadlines set to answer the amended complaints, Defendants filed a motion to dismiss the *Herard* complaint and an answer to the *Carrera* complaint. Mot. to Dismiss, ECF 43, in *Herard*; Answer, ECF 35, in *Carrera*.

On June 25, 2026, the Court granted the parties an extension of time to file their collective action certification motions. *See, e.g.*, Mot. for Extension of Time, ECF 51; June 25, 2026 ECF Order, in *Herard*. The parties' bundled briefing was filed on August 3, 2026. *See* Mot., ECF 52; Mem., ECF 52-1; Herard Opp'n, ECF 53; Reply, ECF 55, in *Herard*; *see also* Mot., ECF 40; Mem., ECF 40-1; Carrera Opp'n, ECF 41; Reply, ECF 43, in *Carrera*. The Honorable Dora L. Irizarry referred the motions to the undersigned on August 6, 2026. *See* Aug. 6, 2026, ECF Order Referring Mot., in *Herard*; Aug. 6, 2026, ECF Order Referring Mot., in *Carrera*.

## DISCUSSION

### I. Legal Standards

Section 216(b) of the FLSA provides employees with a right of action on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b). To determine whether an employee should be permitted to bring a "collective action" under the

---

[4] Although not directly relevant to the instant motion, the Court notes that further discussion was held at the initial conference regarding Defendants' state-court action against Plaintiff Herard, seeking the replevin of certain Google Drive files that allegedly belonged to Defendants, which Herard characterized as retaliatory. Apr. 23, 2026 ECF Min. Entry & Order; *see* Letter Mot. for Pre-Mot. Conference, ECF 11 (seeking to stay the state-court action); Resp., ECF 12; Apr. 22, 2026 ECF Min. Entry (at conference before the Honorable Dora L. Irizarry, Herard indicated he would not proceed with the motion to stay), in *Herard*. The parties later stipulated to a turnover protocol governing the return of these files. *See* Letter, ECF 41, in *Herard*.

FLSA, courts in the Second Circuit apply a two-step analysis for certification. *See Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010); *Zaldivar v. JMJ Caterers, Inc.*, 166 F. Supp. 3d 310, 316 (E.D.N.Y. 2016). "The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers*, 624 F.3d at 555. If the Court finds at the first step that "the putative class is sufficiently similarly situated, the action will be conditionally certified and each class member may then consent in writing to 'opt-in' to the litigation." *Agonath v. Interstate Home Loans Ctr., Inc.*, No. 17-CV-5267 (JS) (SIL), 2019 WL 1060627, at *2 (E.D.N.Y. Mar. 6, 2019) (citing 29 U.S.C. § 216(b)). The second step, sometimes called the "decertification stage," involves determining "whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs," and is made with the benefit of a fuller record. *Jibowu v. Target Corp.*, 492 F. Supp. 3d 87, 118 (E.D.N.Y. 2020); *see also Myers*, 624 F.3d at 555.

"The instant motion concerns only the first step: whether the proposed opt-in members are 'similarly situated' such that conditional certification should be granted." *Zaldivar*, 166 F. Supp. 3d at 317. Satisfying the first prong for conditional certification requires that the plaintiff "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)); *see also id.* ("[T]he purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." (emphasis in original)); *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005) ("The focus of this inquiry . . . is not on whether there has been an actual violation of law but rather on whether the proposed

plaintiffs are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated.").

At this first stage, district courts examine pleadings and affidavits, but "do[] not resolve factual disputes, decide substantive issues going to the ultimate merits or make credibility determinations." *Summa v. Hofstra Univ.*, 715 F. Supp. 2d 378, 385 (E.D.N.Y. 2010). Indeed, if there are ambiguities in the papers, courts are instructed to "draw all inferences in favor of the [p]laintiff." *Mendoza v. Ashiya Sushi 5, Inc.*, No. 12-CV-8629 (KPF), 2013 WL 5211839, at *4 (S.D.N.Y. Sept. 16, 2013). That said, while the "modest factual showing" is deemed "a low standard of proof," it cannot be satisfied by "unsupported assertions." *Myers*, 624 F.3d at 555; *see also Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 480 (S.D.N.Y. 2016); *Thompson v. Glob. Contact Servs., LLC*, No. 20-CV-651 (MKB) (SJB), 2021 WL 3087568, at *3 (E.D.N.Y. July 21, 2021). For example, a plaintiff seeking certification must offer "concrete facts evidencing a common scheme or plan of wage and hour violations for employees engaged in different job functions." *Mata v. Foodbridge LLC*, No. 14-CV-8754 (ER), 2015 WL 3457293, at *3 (S.D.N.Y. June 1, 2015). At the same time, however, "if the plaintiff's allegations are sufficient on their face to support conditional certification, a defendant may not defeat the plaintiff's motion by presenting conflicting factual assertions." *Jeong Woo Kim v. 511 E. 5th St., LLC*, 985 F. Supp. 2d 439, 446 (S.D.N.Y. 2013) (collecting cases).

**II. Analysis**

Plaintiffs move for an order conditionally certifying this case as a collective action on behalf of all similarly situated employees who, during the Collective Period,[5] (1) were paid a day rate regardless of their hours worked and not paid earned overtime (the "Herard Collective"); (2) worked at WakuWaku, were paid a subminimum wage, were subject to allegedly unlawful tip-pooling practices, did not receive sufficient tip credit notice, and were accordingly not paid minimum wage or overtime (the "WW Collective"); (3) worked at Japan Village or Sunrise Mart Brooklyn and were subject to unlawful tip-pooling practices (the "JV-B Collective"); or (4) worked at Panya, Sunrise Mart Midtown, or Sunrise Mart Soho and were subject to unlawful tip-pooling practices (the "P-M-SH Collective"). *See* Am. Compl., ECF 21, ¶¶ 1–5, 93; Mem., ECF 52-1, at 1–2, 7–10, in *Herard*; *see also* Am. Compl., ECF 15, ¶¶ 1–3, 21, 28, 36, 121; Mem., ECF 40-1, at 1–2, 4–8, 12–15, in *Carrera*. As noted, Defendants oppose Plaintiffs' motions for conditional certification and raise several objections to the proposed notice form submitted by Plaintiffs, as well as Plaintiffs' proposed methods of disseminating such forms. *See generally* Herard Opp'n, ECF 53, in *Herard*; Carrera Opp'n, ECF 41, in *Carrera*.

As discussed below, the Court finds that Plaintiffs have made a "modest factual showing" that Plaintiff Herard and other day rate employees were similarly situated in terms of Defendants' alleged FLSA minimum wage and overtime violations and that Plaintiff Carrera and other employees whom Defendants paid a subminimum wage and/or whose tips Defendants retained were similarly situated as to Defendants'

---

[5] The Collective Period is defined in *Herard* as "the three-year period prior to this action's filing date through the date of the final disposition of this action." Am. Compl., ECF 21, ¶ 5, in *Herard*; *see also* Am. Compl., ECF 15, ¶ 21 (referring to, without defining, the "Collective Period"), in *Carrera*.

allegedly unlawful tip-pooling practices under the FLSA. Accordingly, conditional certification is warranted.

**A. Plaintiffs' Supporting Declarations**

In support of their motions for conditional certification, Plaintiffs have submitted sworn declarations describing Defendants' allegedly unlawful employment practices with respect to themselves and similarly situated employees.

*1. Herard*

Plaintiff Herard's declaration reiterates the allegations contained in the amended complaint regarding Defendants' alleged FLSA overtime violations with respect to him. *See* Herard Decl., ECF 52-3, ¶¶ 2, 17, 20–21, in *Herard*. He states that he is "knowledgeable with respect to the pay practices of the Defendant entities, and the wage and hour issues that are the subject of the complaint," because he routinely handled "payroll and related wage documents" in his capacity as Defendants' HR Coordinator. *Id.* ¶¶ 2, 15. Based on his review of these documents, "conversations had with various employees," and his "human resources training," Herard "recognized that Defendants' day-rate compensation structure did not comply with the overtime requirements of the FLSA." *Id.* ¶¶ 16–17.

Plaintiff Herard states that prior to his termination, he "spoke with various employees of Japan Village, Sunrise Mart Midtown, Sunrise Mart SoHo, Sunrise Mart Brooklyn, WakuWaku, Panya and JTunes about Defendants' practice of paying on a day rate basis," including "Yoshimichi Ozawa and Qiang (Charlie) Lin, Japan Village cooks, and Felipe Rivera, a Waku Waku cook." *Id.* ¶¶ 22–23. He further spoke about these practices with "Senen Vidals, a Floor Manager at Sunrise Mart Brooklyn, Kein Lim, a floor staff member at the time and now manager at Sunrise Mart Midtown, and Marco Ramirez[,] a Floor staff at Sunrise Mart SoHo," all of whom confirmed that they

received a flat daily rate for their services and had never received overtime "when they worked over 40 hours in a workweek," as well as "Panya bakers Geronimo Salas and Telesforo Guzman [and] pastry chef Minako Fujiwara," who confirmed that they received a flat daily rate and no overtime. *Id.* ¶¶ 24–25. These conversations were corroborated by "[p]ayroll and other records Defendants maintain" that Herard has viewed for each of the Corporate Defendants. *Id.* ¶¶ 26–27.

2. *Carrera*

Plaintiff Carrera submits four sworn declarations in support of his motion, from Plaintiff Carrera himself, opt-in Plaintiffs Manyi (Melody) Cheng and Emily Valencia, and Herard. *See generally* Carrera Decl., ECF 40-3; Cheng Decl., ECF 40-4; Valencia Decl., ECF 40-5; and Herard Decl., ECF 40-6, in *Carrera*.

Plaintiff Carrera's declaration reiterates the allegations in the amended complaint with respect to him. *See generally* Carrera Decl., ECF 40-3, in *Carrera*. He states that there were other tipped employees with whom he worked over his years of service at WakuWaku, with whom he had conversations about their work and pay, including Nicholas Moseley, Melody Anthony, Michele Tjandra, and Jair Martinez, among others whose names Carrera does not recall. *Id.* ¶¶ 19–20. Specifically, Plaintiff discussed:

> "errors we believed had been made in calculating our earnings, the fact that we did not receive overtime pay when our hours exceeded 40 hours in a given workweek, concerns about the distribution of the tips we were required to place into the tip pool, and the fact that we were required to share significant portions of our pooled tips with others who had no interaction with customers" with these other workers.

*Id.* ¶ 20. Additionally, although Carrera does not "possess personal knowledge with respect to the pay practices employees were subject to at Defendants' other locations," he believes that all Defendant entities "utilize similarly unlawful tip pooling practices," based on his conversations with Herard whom, Carrera states, "has intimate knowledge

of the Defendants' pay practices, and discussions with other employees regarding those practices" given "his prior employment as a human resources employee for Defendants." *Id.* ¶¶ 21–22.

Opt-in Plaintiff Cheng's declaration states that, from June 2023 to August 2024, she worked for Sunrise Mart Brooklyn and Sushi Uesugi, a sushi bar operated by Japan Village. Cheng Decl., ECF 40-4, ¶ 3, in *Carrera*. While working at Sunrise Mart Brooklyn, her primary responsibilities included "operating the cash register, scanning and processing customer purchases, handling cash and credit card transactions, issuing receipts, and providing customer service at checkout." *Id.* ¶ 5. While working at Sushi Uesugi, she "greeted and seated guests, explained menu items, took and entered food and beverage orders, delivered food and drinks, responded to customer requests, processed payments, and reset and cleaned table settings." *Id.* ¶ 6. On multiple occasions during her employment, although she was "scheduled to work for either Sushi Uesugi or Sunrise Mart Brooklyn, [she] was directed to work for the other entity." *Id.* ¶ 4. Additionally, she "observed employees from Japan Village come into Sunrise Mart Brooklyn to obtain supplies for Japan Village operations . . . without making payment." *Id.*

Plaintiff Cheng states that when she worked for Sunrise Mart Brooklyn, her "tips were pooled with tips received by employees of Japan Village's various on-site businesses including Sushi Uesugi," and vice versa. *Id.* ¶ 7. She "rarely received any of the tips that were given to [her] by customers" except for the occasional nominal cash payment, which she was told represented her tips; when she was working at Sushi Uesugi, this "resulted in [her] oftentimes receiving less than minimum wage." *Id.* ¶ 8. Cheng states that her "employer never explained how the tip pool worked, to whom the tips were distributed, or how [her] share was calculated," and other Japan Village and

Sunrise Mart Brooklyn employees with whom Plaintiff spoke were likewise unaware of how their tips were being distributed. *Id.* ¶¶ 9–10. Ultimately, Plaintiff Cheng "ceased working for Defendants due to the low wage [she] was receiving," as well as her "belief the tips [she] was receiving were being improperly diverted to others who had not earned them" *Id.* ¶ 11.

Opt-in Plaintiff Valencia's declaration states that, from June 2023 to August 2024, she also worked for Sunrise Mart Brooklyn and Sushi Uesugi. Valencia Decl., ECF 40-5, ¶ 3, in *Carrera*. Like Cheng, she was directed to perform work at Sunrise Mart Brooklyn while scheduled to work at Sushi Uesugi and vice versa. *Id.* ¶ 5. Additionally, over the course of her employment, she observed Japan Village employees obtaining milk and rice from Sunrise Mart Brooklyn to use in Japan Village operations without paying for such items. *Id.* ¶ 4. Plaintiff Valencia's job duties were substantially similar to those of Plaintiff Cheng; she additionally states that, while working at Sushi Uesugi, she "was paid below the minimum wage and received tips from customers." *Id.* ¶ 7. Plaintiff Valencia states that she was subject to the same tipping practices as Plaintiff Cheng. *Id.* ¶¶ 8–9. She further states that she had conversations with other Japan Village and Sunrise Mart Brooklyn employees about the fact that they did not understand how their tips were calculated, or why non-tipped employees were sharing in the tips; these other employees included "Aneliz, Melody, Tamara, Aurora, Marie, Vanessa and Denise," whose last names Plaintiff Valencia does not know. *Id.* ¶ 11.

Herard's declaration states that, as discussed in *Herard*, where he is the lead plaintiff, he is knowledgeable with respect to Defendants' pay rate practices, including their tip-pooling practices, because he was previously employed as a human resources employee by Defendant Japan Village and "reviewed and had routine access to the payroll records, pay stubs, tip distribution records, personnel files, LS-54 wage notices

and employee classification sheets for the defendant entities." Herard Decl., ECF 40-6, ¶¶ 1–2, 4, in *Carrera*. He states that in preparing to assert his rights under applicable laws, he "spoke with former employees of these entities who I believe possessed wage and hour claims," including Plaintiff Carrera, who confirmed "that he was required to participate in WakuWaku's tip pool." *Id.* ¶¶ 6–7. He states that he spoke with nearly 30 other employees of Defendants' businesses, identified by name in the declaration, who "confirmed that they were required to contribute their tips to a shared tip pool, which was then distributed in a manner that included employees who were not customarily and regularly tipped or they received tips from other pools." *Id.* ¶ 8.

Herard states that, based on his review of personnel files and payroll records and conversations he has had with the relevant employees, WakuWaku workers "did not sign a complete and accurate LS-54 Tip Notice," nor was "the tip credit [] properly explained to them." *Id.* ¶ 11. Additionally, based on Herard's "review of tip distribution records, payroll records, personnel files, and conversations" with Sunrise Mart Brooklyn and Japan Village employees, he is "aware that tips received at Japan Village were pooled together with tips received at Sunrise Mart Brooklyn, with a portion of the tips shared with workers who were not tip eligible." *Id.* ¶ 12. Finally, based on Herard's review of records pertaining to Sunrise Mart Midtown, Sunrise Mart SoHo, Panya Bakery, and JTunes, as well as conversations with relevant employees, "tips received from customers were shared with workers who were not customarily and regularly tipped, including back-of-house kitchen and food preparation personnel and supervisory employees." *Id.* ¶ 13.

**B. Conditional Certification**

The Court now turns to whether Plaintiffs have made the "'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common

policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann*, 982 F. Supp. at 261); *see also Thompson*, 2021 WL 3087568, at *3 ("Key to this showing is whether plaintiffs 'provide actual evidence of a factual nexus between their situation and those that they claim are similarly situated rather than mere conclusory allegations.'" (quoting *Qing Gu v. T.C. Chikurin, Inc.*, No. 13-CV-2322 (SJ) (MDG), 2014 WL 1515877, at *3 (E.D.N.Y. Apr. 17, 2014))). Plaintiffs argue that their pleadings and declarations make the required factual showing to demonstrate that they and similarly situated employees were victims of a common policy or plan that violated the law — with respect to Herard, a compensation plan that misclassified employees as overtime exempt, and tip-pooling and -retention practices with respect to Carrera. *See* Mem., ECF 52-1, at 7–9, in *Herard*; Mem., ECF 40-1, at 12–15, in *Carrera*.

As to *Herard*, Defendants argue that allowing Plaintiff Herard to bring the instant claims would be an "abuse of the conditional certification process" because he was "hired to provide HR expertise" to Defendants and "approved the practice of paying on a day rate." Herard Opp'n, ECF 53, at 4–5, in *Herard*. In a similar vein, Defendants argue that Plaintiff Herard's "role in the facts leading to this claim creates a conflict of interest between Plaintiff and the putative collective members," rendering him "unfit to bring this motion," because, they contend, Herard was essentially a managerial employee and, accordingly, is not similarly situated to the other collective members. *Id.* at 6–9.

As to *Carrera*, Defendants principally contend that "a sweeping, multi-location[] collective" is not appropriate in light of the "absence of a uniform tip policy," since "Plaintiffs have demonstrated different alleged practices across locations." Carrera Opp'n, ECF 41, at 7–8, 14–19, in *Carrera*. Defendants further take issue with Plaintiffs' declarations, which, they contend, do not "provide[] competent evidence of a common practice." *Id.* at 8–9. Defendants urge the Court to reject Plaintiffs' single-enterprise

theory because they "must offer some factual showing that 'each location had employees that were similarly situated with regard to the alleged[ly] unlawful [ . . .] policies.'" *Id.* at 11 (quoting *Munoz v. Grp. US Mgmt. LLC*, 348 F.R.D. 192, 205 (S.D.N.Y. 2025) (internal quotation marks omitted)); *see id.* at 11–13.

Having reviewed the amended complaints, the records, and Plaintiffs' motions, which include the above-described declarations, the Court finds that Plaintiffs have made a "modest factual showing" sufficient to grant conditional certification of collectives as to (1) Defendants' day rate employees who were not paid overtime; (2) Defendants' tipped employees who were not paid minimum wage, not given notice of Defendants' intent to claim a tip credit, and required to share their tips with non-tip eligible employees; and (3) Defendants' tipped employees who were required to share their tips with non-tip eligible employees.

1. *Unlawful Policy*

a. <u>Herard</u>

To bring a collective action, a plaintiff must first show that they, personally, were a victim of a defendant's illegal pay practices. *See Cruz v. Ham N Eggery Inc.*, No. 15-CV-3228 (JBW) (MDG), 2016 WL 4186967, at *4 (E.D.N.Y. Aug. 8, 2016); *Jeong Woo*, 985 F. Supp. 2d at 447. In this case, Plaintiff Herard has moved for collective certification under the FLSA based on claims of Defendants' failure to pay overtime as required by federal law, as a result of Defendants' practice of paying certain nonexempt employees a daily rate regardless of hours worked. *See* Am. Compl., ECF 21, ¶¶ 1–7, 22–25, 93–102; *see also* Mem., ECF 52-1, at 7–10, in *Herard*. Specifically, Herard contends that "[t]he duties performed by the Collective of Day Rate Employees were nonexempt in nature and, as such, Defendants were required to pay them lawful overtime premiums for all hours worked in a workweek over 40," but that Defendants paid such employees a day

rate for their services and did not pay them overtime when they worked over 40 hours in a given workweek. Am. Compl., ECF 21, ¶¶ 93–98, in *Herard*. He further avers that "Defendants maintain business records that show certain of their workers were or are paid a flat fee for their services irrespective of the number of hours actually worked," a fact of which he is familiar because he was formerly the HR Coordinator for Defendants. Mem., ECF 52-1, at 7–8 (citing Herard Decl., ECF 52-3, ¶¶ 15–17, 25–26), in *Herard*.

The Court finds that Plaintiff Herard has attested to facts sufficient at this stage to show that he was subject to an unlawful overtime policy in violation of the FLSA. As relevant here, the FLSA exempts from overtime coverage "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213, which is defined as "any employee" (1) who is "compensated on a salary basis . . . at a rate of not less than $684 per week"; (2) "whose primary duty is management of the enterprise in which the employee is employed"; (3) "who customarily and regularly directs the work of two or more other employees"; and (4) "who has the authority to hire or fire other employees," or whose suggestions and recommendations regarding hiring, firing, promotion, or other job changes "are given particular weight," 29 C.F.R. § 541.100 (capitalization modified); *see Jeong Woo Kim*, 985 F. Supp. 2d at 444–45; *see also id.* (noting that "'because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed,'" and that "because the FLSA's exemptions are affirmative defenses to minimum wage and overtime claims, an 'employer bears the burden of proving that its employees'" are exempt (quoting *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991))).

Here, Plaintiff Herard alleges that although he "routinely worked in excess of 40 hours per week," he "was never compensated for his extra hours, much less paid overtime for those extra hours," and was instead paid a flat "day rate for his services, regardless of the number of hours actually worked." Am. Compl., ECF 21, ¶¶ 22–23; *see id.* ¶¶ 24–25; *see also* Herard Decl., ECF 52-3, ¶ 17, in *Herard*. Although Herard states that his "primary responsibilities included handling human resources functions" for Defendants, he was "also regularly tasked with a wide range of non-exempt clerical responsibilities and manual work assignments." Herard Decl., ECF 52-3, ¶ 2; *see* Am. Compl., ECF 21, ¶¶ 16–17 (discussing his job responsibilities), in *Herard*. His declaration states, further, that he "did not exercise supervisory authority over two or more full-time employees, nor did [he] exercise any meaningful independent discretion over matters of significance." Herard Decl., ECF 52-3, ¶ 18; *see* Am. Compl., ECF 21, ¶¶ 18–20 (alleging that Herard never exercised supervisory authority, and "[a]ll true managerial decisions were reserved to the individual defendants"), in *Herard*.

In this preliminary context, the Court finds these facts sufficient to allege a policy by which Plaintiff Herard was a nonexempt employee who did not receive overtime compensation, in possible violation of the FLSA. *See Han v. Shang Noodle House, Inc.*, No. 20-CV-2266 (PKC) (VMS), 2021 WL 3774186, at *9 (E.D.N.Y. Aug. 24, 2021) ("[T]o the extent Plaintiff alleges that Defendants paid him a flat monthly salary but did not pay him one-and-a-half times his regular rate for each hour worked in excess of 40 in a week, Plaintiff sufficiently alleges that he suffered a violation of federal overtime wage law."); *Chui v. Am. Yuexianggui of LI LLC*, No. 18-CV-5091 (SJF) (AKT), 2020 WL 3618892, at *7 (E.D.N.Y. July 2, 2020) (finding that an affidavit averring that plaintiff consistently worked more than 40 hours per week for defendants but "was paid a fixed salary . . . that did not properly compensate her for overtime hours" was sufficient to

"allege that Plaintiff was subject to a policy or plan which violated the FLSA"); *Jing Fang Luo v. Panarium Kissena Inc.*, No. 15-CV-3642 (WFK) (ST), 2016 WL 11263668, at *5 (E.D.N.Y. Nov. 23, 2016) ("Here, for purposes of conditional certification only, Plaintiffs established an 'unlawful policy' whereby Defendants violated the FLSA . . . ."), *report and recommendation adopted*, 2017 WL 1216571 (E.D.N.Y. Mar. 30, 2017).

b. Carrera

Likewise, the Court finds that Plaintiff Carrera, as well as opt-in Plaintiffs Cheng and Valencia, have attested to facts sufficient to show that they were subject to an unlawful tip policy in violation of the FLSA.

As relevant to their allegations, under the FLSA, "an employer may pay an employee who receives tips a rate below the minimum wage, so long as the wage paid plus the employee's tips equals or exceeds the minimum wage." *Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 494 (S.D.N.Y. 2024) (citing 29 U.S.C. § 203(m)). An employer may not avail itself of a "tip credit," however, if the employer does not provide sufficient notice of its intent to use the tip credit to offset the employee's wages, or if the employer distributes pooled tips to workers who are ineligible for tip pooling (such as managerial staff, or workers who do not provide direct customer service). *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 239–40 (2d Cir. 2011); *Galvez v. 800 Ginza Sushi Inc.*, No. 19-CV-8549 (JPC), 2022 WL 748286, at *9 (S.D.N.Y. Mar. 11, 2022); *see also Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002) (explaining that employees may choose to pool their tips, or employers may require them to, as long as the employees retain the tips they earned); *Mangahas*, 754 F. Supp. 3d at 495–96 (explaining that notice of intent to apply a tip credit offset may be given orally, but must convey certain, specific information). Thus, "[t]he two prerequisites that the employer must fulfill to be eligible for the tip credit are strictly

construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Chung*, 246 F. Supp. 2d at 229.

Separately, the FLSA also provides that: "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit," or whether or not the employee is paid minimum wage. 29 U.S.C. § 203(m)(B). In 2018, Congress created a new cause of action to vindicate this right, amending Section 216(b) to provide that "[a]ny employer who violates section 203(m)(2)(B) . . . shall be liable to the employee or employees affected in the amount of . . . all such tips unlawfully kept by the employer, and in an additional amount as liquidated damages." *Id.* § 216(b); *see Benavidez v. Greenwich Hotel Ltd. P'ship*, No. 3:16-CV-191 (VAB), 2019 WL 1230357, at *12 (D. Conn. Mar. 15, 2019) (citing Pub. L. 115-141, 132 Stat. 348, div. S, tit. XII, § 1201 (2018)); *see also Nwajei v. E&E of Five Towns, Inc.*, No. 23-CV-5541 (JMA) (JMW), 2024 WL 3522108, at *6 (E.D.N.Y. July 9, 2024), *report and recommendation adopted*, 2024 WL 3520633 (E.D.N.Y. July 24, 2024). *But see Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 562 (S.D.N.Y. 2013) (holding, in 2013, that "[s]ection 203(m) imposes conditions on tip-pooling arrangements as a means of vindicating the FLSA's minimum wage requirement" and does not "impose a nationwide freestanding code of conduct regarding the handling of tip money where the statute's minimum-wage command is otherwise met").

Here, Plaintiff Carrera's declaration states that he was a server at WakuWaku, and he was "paid a sub-minimum hourly wage plus tips." Carrera Decl., ECF 40-3, ¶ 5, in *Carrera*. Although he received a "Notice of Pay Rate and Payday" form as required by the NYLL (a "LS-54 Form") when he was first hired, in 2021, he does not recall this form referencing Defendants' intent to take a tip credit. *Id.* ¶¶ 2, 6. This is consistent

with an LS-54 form he received in 2026, which stated that his cash wage was increasing from $11.00 to $11.35 per hour; that no allowances were being taken; that his employer was Japan Village; and was not signed by himself or by a representative of Defendant. *Id.* ¶ 7. Although he was "advised orally that a tip credit would be taken," he does not recall "being told the amount being claimed as a tip credit, that the tip credit claimed by WakuWaku cannot exceed the amount of tips I actually received, and/or that I am entitled to retain all tips except pursuant to a valid tip-pooling arrangement limited to employees who customarily and regularly receive tips." *Id.* ¶ 8. Later, Plaintiff learned that he was subject to a mandatory tip pool, where tips were shared between customer-facing positions, non-customer facing positions, and management, and management determined what Carrera's share of tips would be in accordance with arbitrary performance goals. *Id.* ¶¶ 9–16. Carrera had conversations with several of his WakuWaku coworkers about these issues, in addition to the fact that they did not receive overtime when they worked over 40 hours in a given workweek. *Id.* ¶ 20. Carrera also provided corroborating exhibits. *See* Cohen Decl., Ex. E (photograph of LS-54 form received in 2026), ECF 40-7; Cohen Decl., Ex. F (photograph of Defendants' tipping policy), ECF 40-8; Cohen Decl., Ex. G (notice of tip percentage adjustment), ECF 40-9; Cohen Decl., Ex. H (tip reports), ECF 40-10; Cohen Decl., Ex. I (text message from manager translated from Japanese), ECF 40-11; Cohen Decl., Ex. J (Pay Stub), ECF 40-12, in *Carrera*.

Opt-in Plaintiffs Cheng and Valencia attest similarly as to their employment at Sushi Uesugi. *See generally* Cheng Decl., ECF 40-4; Valencia Decl., ECF 40-5, in *Carrera*. They aver that they only received less than the minimum wage when their tips were withheld only while working at Sushi Uesugi, the restaurant operated by Japan Village, not while working at Sunrise Mart Brooklyn. *See* Cheng Decl., ECF 40-4, ¶ 8 ("I rarely

received any of the tips that were given to me by customers, and when that occurred during my stint at Sushi Uesugi, that resulted in me oftentimes receiving less than minimum wage."); Valencia Decl., ECF 40-5, ¶ 9 ("I rarely received any of the tips that were given to me by customers, and when I worked at Sushi Uesugi that resulted in me receiving less than minimum wage."), in *Carrera*. They also state that they spoke with coworkers at both Japan Village and Sunrise Mart Brooklyn about their concerns that "tips were distributed not only to customer-facing workers . . . but with other workers (and possibly managers) who did not interact with customers in any meaningful way." Cheng, ECF 40-4, ¶¶ 9–10; *see* Valencia Decl., ECF 40-5, ¶¶ 10–12, in *Carrera*.

As discussed above, the FLSA prohibits an employer from paying a worker a subminimum wage and claiming a tip credit if (1) no notice of the tip credit is given or (2) the employer forces the employee to participate in a tip pool with other employees who do not customarily receive tips. *See Shahriar*, 659 F.3d at 253. Additionally, the FLSA prohibits managerial or supervisory staff from keeping any share of tips regardless of whether the employee is paid a minimum wage or the employer takes a tip credit. 29 U.S.C. §§ 203(m)(2)(B), 216(b).

The Court finds that the allegations and pleadings are sufficient to show that Plaintiff Carrera and opt-in Plaintiffs Cheng and Valencia were personally subject to a tipping policy that may have violated the FLSA. *See, e.g.*, *Munoz v. Grp. US Mgmt. LLC*, 348 F.R.D. 192, 203 (S.D.N.Y. 2025) (preliminarily certifying collective action that included workers subjected to unlawful tip pool arrangements that improperly included non-tipped employees), *reconsideration denied*, No. 22-CV-4038 (MKV) (HJR), 2025 WL 615132 (S.D.N.Y. Feb. 11, 2025); *Chhab v. Darden Rests., Inc.*, No. 11-CV-8345 (NRB), 2013 WL 5308004, at *13 (S.D.N.Y. Sept. 20, 2013) (same).

2. *Single Enterprise*

"When evaluating whether a group of distinct but closely affiliated entities should be treated as a single employer for FLSA purposes, courts consider the interrelation of operations, including whether there is centralized control of labor relations, common management, and common ownership or financial control." *Taveras v. D & J Real Estate Management II, LLC*, 324 F.R.D. 39, 41 (S.D.N.Y. 2018); *see Lamb v. Singh Hosp. Grp., Inc.*, No. 11-CV-6060 (MKB) (ARL), 2013 WL 5502844, at *4 (E.D.N.Y. Sept. 30, 2013). When the question of whether a group of defendants should be treated as a single integrated enterprise, courts often "defer this analysis to the second stage of certification, because '[w]hether or not Defendants operated as a single enterprise is a complicated and fact-specific inquiry,' which is not properly determined at the collective action certification stage." *Lijun Geng v. Shu Han Ju Rest. II Corp.*, No. 18-CV-12220 (PAE) (RWL), 2019 WL 4493429, at *7 (S.D.N.Y. Sept. 9, 2019) (quoting *Uraga v. Amici 519 LLC*, No. 17-CV-3547 (ALC) (KNF), 2018 WL 3579850, at *4 (S.D.N.Y. July 25, 2018)) (internal quotation marks omitted). That said, "[c]ourts often authorize notice to employees of [worksite] locations where the named plaintiff did not work at all, as long as there is sufficient evidence that those employees were subject to the same allegedly unlawful policies." *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 370 (S.D.N.Y. 2014) (collecting cases).

Here, Plaintiffs' allegations and declarations provide a sufficient basis for the Court to find, at the collective certification stage, that Defendants operated as a single, integrated enterprise. Plaintiff Herard's declaration states that his primary job responsibilities "included handling human resources functions for all of the" Defendant entities, which were all "centrally managed by" the Individual Defendants and a general manager, Kai Ebihara. Herard Decl., ECF 52-3, ¶¶ 2–3, in *Herard*. He goes on to

aver that "[t]he same data, HR, and IT systems are used for all locations," and that both compensation and disciplinary policies are standardized across all locations. *Id.* ¶¶ 4–5. Plaintiff Herard further identifies three individuals by name who handle and process payroll. *Id.* ¶ 7.

Plaintiff Herard states that "[e]mployees were routinely shared between entities when a given location was understaffed," he "personally observed numerous instances where employees were directed to work at locations other than the one where they were originally hired, without any separate application process or retention," and identifies ten employees by name who were assigned to work at multiple locations. *Id.* ¶¶ 5, 8. The declarations of opt-in Plaintiffs Cheng and Valencia, who were both assigned to work at Japan Village and Sunrise Mart Brooklyn, corroborate these assertions. *See* Cheng Decl., ECF 40-4, ¶¶ 3–4; Valencia Decl., ECF 40-5, ¶¶ 3, 5, in *Carrera*. In addition, Plaintiff Carrera states that, although he worked as a server for WakuWaku, he received an LS-54 form indicating that his employer is Japan Village. Carrera Decl., ECF 40-3, ¶ 7; *see* Notice of Pay Rate, ECF 40-7, in *Carrera*. Plaintiff Herard states that "equipment and supplies were routinely shared, intermingled, and transferred between the different Defendant Corporations' locations as needed," and cites various examples, including that he observed the head chef at WakuWaku + Oldies retrieve milk from the refrigerator at Panya and recalled that a point-of-sale system/terminal was transferred from Japan Village to Sunrise Mart Soho. Herard Decl., ECF 52-3, ¶¶ 9–13, in *Herard*. Opt-in Plaintiff Valencia likewise "observed employees from Japan Village come into Sunrise Mart Brooklyn to obtain items such as milk and rice to use in Japan Village's operations and leave with those items without paying" over the course of her employment. Valencia Decl., ECF 40-5, ¶ 4, in *Carrera*. Finally, Defendants do not meaningfully dispute Plaintiffs' characterizations of the

businesses as a single integrated enterprise. *See* Carrera Opp'n, ECF 41, at 12 n.2 (stating that although "Defendants do not concede that they operate a single, integrated enterprise," "the merits of this claim are not relevant at the conditional certification stage"), in *Carrera*.

The Court finds that the statements in the above declarations provide "sufficient indicia of commonality and centralized operations" to warrant a finding that Defendants are a single integrated enterprise under the FLSA for the purposes of the instant motions. *Marin v. Apple-Metro, Inc.*, No. 12-CV-5274 (ENV) (CLP), 2014 WL 11035376, at *7 (E.D.N.Y. July 29, 2014), *report and recommendation adopted*, 2014 WL 7271591 (E.D.N.Y. Dec. 18, 2014); *see Juarez*, 29 F. Supp. 3d at 367–68 (finding that defendants operated as a single integrated enterprise, and therefore qualified as a single statutory employer under the FLSA, where plaintiff was directed to work across multiple locations, plaintiff alleged centralized operational and labor control, and common management); *Lijun Geng*, 2019 WL 4493429, at *13 (same where defendants shared owners, supplies, and employees).

### 3. *Similarly Situated*

#### a. <u>Herard</u>

Next, the Court considers whether similarly situated employees exist with respect to Defendants' alleged FLSA overtime violations. *See Myers*, 624 F.3d at 555; *Young*, 229 F.R.D. at 54; *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 515 (2d Cir. 2020) ("One of the principal conditions to proceeding collectively under § 216(b) is that the named plaintiffs be 'similarly situated' to the opt-in 'party plaintiff[s].'" (quoting 29 U.S.C. § 216(b))). In the FLSA overtime exemption context, as here, this is accomplished by demonstrating that other employees "'are similarly situated with

respect to their job requirements and with regard to their pay provisions,' on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme." *Myers*, 624 F.3d at 555 (quoting *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008) (internal quotation marks omitted)); *see Mendoza v. Little Luke, Inc.*, No. 14-CV-3416 (JS) (AYR), 2015 WL 5918580, at *3–4 (E.D.N.Y. Oct. 9, 2015) (noting that, although "[c]ourts in this district and elsewhere routinely reject attempts to limit certification based on job function," *Myers* "stands for the proposition that job duties must be considered when determining whether the proposed collective members are similarly non-exempt employees subject to protection of the labor laws").

Here, Plaintiff has provided sufficient information for the purposes of conditional certification to find that Defendants' employees who were paid a day rate regardless of hours worked and not paid overtime are "similarly situated victims of a common policy or plan that violated the law." *Chui*, 2020 WL 3618892, at *7 (quotation marks omitted). According to Plaintiff Herard's declaration, there are at least 10 other individuals employed by Defendants — whom Herard describes by name and job title — who confirmed to Herard that they were paid a flat daily rate and were not paid overtime when such overtime was earned. *See* Herard Decl., ECF 52-3, ¶¶ 22–27, in *Herard*. These individuals include cooks, bakers, and a pastry chef, as well as floor managers and staff at different Sunrise Mart locations. *Id.* Furthermore, Herard's declaration avers that he is knowledgeable about these pay practices because he routinely handled "payroll and related wage documents" in his capacity as Defendants' HR Coordinator. *Id.* ¶¶ 2, 15. Based on the above, the Court finds that Plaintiff's allegations are sufficient at this stage to establish a factual nexus between the respective situations of Plaintiff and other day rate employees. *See Chui*, 2020 WL 3618892, at *7.

Defendants argue that the Court should not find Plaintiff Herard to be similarly situated to potential opt-in plaintiffs because as HR Coordinator, Plaintiff was effectively a "managerial employee" and that, accordingly, a "conflict of interest" exists between Herard and other potential opt-ins.[6] Herard Opp'n, ECF 53, at 5, 6; *see id.* at 2 (arguing that Herard was "known to employees as a management figure"), 4–9 (arguing that Herard is "unsuited to bring a collective action on behalf of other employees" and that the Court should use its discretion to deny the instant motion (capitalization modified)), in *Herard*. This argument, however, misconstrues the standard: "[T]he key question for the similarly situated inquiry is not whether plaintiff's job duties are identical to other potential opt-in plaintiffs, but rather, whether the proposed plaintiffs are similarly situated . . . with respect to their allegations that the law has been violated." *Knox v. John Varvatos Enters. Inc.*, 282 F. Supp. 3d 644, 656 (S.D.N.Y. 2017) (quotations marks omitted); *cf. Colon v. Major Perry St. Corp.*, No. 12-CV-3788 (JPO), 2013 WL 3328223, at *7 (S.D.N.Y. July 2, 2013) (excluding handymen from a collective action of superintendents where the two jobs had "different overtime policies[] and different compensation schemes," and plaintiffs offered almost no "evidence concerning the handymen").

[6] To the extent that Defendants contend that Herard is conflicted as a potential defendant in this case — *i.e.*, as an employer under the FLSA — this argument goes to the merits of Herard's claims and is not appropriately considered on a motion for conditional certification. Herard Opp'n, ECF 53, at 6–7, in *Herard*; *see Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007) (at the preliminary certification stage, "the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations"); *see also Jeong Woo Kim v. 511 E. 5th St., LLC*, 985 F. Supp. 2d 439, 447 (S.D.N.Y. 2013) (dismissing the defendants' argument that the plaintiff was exempt from the FLSA's overtime requirements as a "premature merits determination that is proscribed at the preliminary certification stage").

When the plaintiff's claims depend on whether they were exempt from the FLSA's overtime protections, courts must consider the potential opt-in plaintiff's job duties. *See Myers*, 624 F.3d at 555. However, the inquiry turns on whether the plaintiff's pleadings and declarations "plausibly lead to the inference" that their job duties render them nonexempt, such that they were subject to the same alleged violation — not whether they were tasked with the same day-to-day responsibilities. *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012), *adopted*, No. 09-CV-9575 (LAP) (GWG), 2012 WL 2588771 (S.D.N.Y. July 2, 2012); *Mendoza*, 2015 WL 5918580, at *4 (observing that "job duties must be considered when determining *whether the proposed collective members are similarly non-exempt employees*" (emphasis added)).

Here, Plaintiff Herard's declaration identifies multiple individuals by name and job title who, like him, were paid based on days, not hours, worked, and were not paid overtime when they worked over 40 hours in a workweek. Herard Decl., ECF 52-3, ¶¶ 22–27, in *Herard.* Although Plaintiff does not go into great detail as to these individuals' specific job responsibilities as cooks, bakers, and floor managers/staff at a supermarket, the Court notes that workers with similar job titles are commonly assumed to be nonexempt in this context. *See, e.g.*, *Garcia Ramos v. DNC Food Service Corp.*, No. 19-CV-2967 (VSB), 2020 WL 2832776, at *6 (S.D.N.Y. June 1, 2020) (conditionally certifying a collective on claim for failure to pay overtime to "a range of employees — including front-of-house employees such as cashiers, countermen, deliverymen, salad makers, grillmen, and porters; and back-of-house employees like bread makers, food prep cooks, and cooks; in other words, every conceivable type of employee of a delicatessen"); *Cano v. Four M Food Corp.*, No. 08-CV-3005 (JFB) (AKT), 2009 WL 5710143, at *5 (E.D.N.Y. Feb. 3, 2009) (same as to grocery workers); *see also Hernandez v. Fu Long Food Prod. Inc.*, No. 24-CV-8391 (NCM) (MMH), 2025 WL 2470668,

at *7 (E.D.N.Y. Aug. 26, 2025) (collecting cases finding that food service workers are not exempt under the FLSA), *report and recommendation adopted*, 2025 WL 2653909 (E.D.N.Y. Sept. 16, 2025); *see also Torres v. Jin Xiang Trading Inc.*, No. 17-CV-2866 (RJD) (PK), 2020 WL 9814080, at *7 (E.D.N.Y. Mar. 12, 2020) (finding that deliverymen and store helpers at grocery goods store and wholesale beer distribution business were not exempt), *report and recommendation adopted*, Mar. 31, 2020 ECF Order Adopting R. & R. Further, Plaintiff states that the Sunrise Mart workers with whom he spoke "spent their days filleting fish, cutting vegetables, and performing similar low-skill tasks in the three supermarkets," which the Court can fairly infer brings these employees into the ambit of the non-exempt workers described above. Herard Decl., ECF 52-3, ¶ 24, in *Herard.* This is sufficient, at this stage, to meet Herard's burden. *See Puglisi v. TD Bank, N.A.*, 998 F. Supp. 2d 95, 101 (E.D.N.Y. 2014) (finding that, even if certain individuals who are part of the certified collective had "widely disparate responsibilities" or "performed managerial work," "at this early juncture, the burden upon plaintiffs is extraordinarily low, and the issues need not be conclusively resolved").

Finally, Defendants challenge Herard's evidentiary basis for this showing, arguing that his declaration "contains generalized, conclusory, assertions that he 'spoke with various employees' who were paid a flat daily rate and not paid overtime." Herard Opp'n, ECF 53, at 12–13, in *Herard*. Defendants insist that Herard's averments are deficient because he did not include certain details in his declaration, such as where or when his conversations with his coworkers occurred. *Id*. However, the cases Defendants cite deal with situations where the plaintiff offered essentially *no* information about how they acquired their personal knowledge of the potential opt-in plaintiffs' circumstances. *See, e.g.*, *Sanchez v. JMP Ventures, L.L.C.*, No. 13-CV-7264 (KBF), 2014 WL 465542, at *2 (S.D.N.Y. Jan. 27, 2014) (denying collective certification where plaintiff

submitted single affidavit and did not "provide *any* detail as to a *single* such observation or conversation" (emphasis in original)); *Taveras*, 324 F.R.D. at 41 (same where plaintiffs did not "identify the names or job titles of any person who worked at other locations; they provide no evidence that the handbook applies to employees in other locations; they do not state the specifics of any conversations with other employees; and they do not explain how they had the opportunity to observe the regular work schedules of employees at other locations").

Here, by contrast, Herard not only included the first names, last names, and job titles of at least 10 employees with whom he spoke, but he also averred that he was "routinely sought out by employees . . . regarding concerns about a wide range of employment-related matters, including the overtime violations that are the subject of this lawsuit" in his capacity as HR Coordinator, providing an ample basis to support Plaintiff Herard's personal knowledge of the pay practices across each worksite at issue here. Herard Decl., ECF 52-3, ¶¶ 19, 22–27, in *Herard*. Plaintiff Herard also bases his personal knowledge of these facts on "[p]ayroll and other records Defendants maintain and that I have viewed," to which he had unique access as Defendants' HR Coordinator. *Id.* ¶¶ 2, 15–16, 26. The Court finds that this is a sufficient evidentiary showing at this stage. *See Hernandez v. Bare Burger Dio Inc.*, No. 12-CV-7794 (RWS), 2013 WL 3199292, at *3 (S.D.N.Y. June 25, 2013) (collecting cases approving collective certification based on single affidavit supported solely by plaintiffs' personal observations); *Munoz*, 348 F.R.D. at 203 (explaining that "plaintiffs are not required to provide the times and dates of the conversations, so long as a court can fairly infer that other [employees] labored under similar working conditions and thus suffered the same violations of the FLSA" (quotation marks omitted)).

Against this factual backdrop, the Court finds that Plaintiff Herard's declaration provides sufficient detail to allow the Court to find that there exist similarly situated plaintiffs who experienced the same potential violations of the FLSA while working at each of Defendants' locations, with the exception of JTunes.[7]

b. Carrera

Here, the Court likewise finds that Plaintiff Carrera has provided sufficient information to conclude that there exist similarly situated employees of Defendants who were subject to potentially unlawful tip-pooling practices under the FLSA.

As set forth above, the declarations discuss a variety of workers across Defendants' businesses who were never informed that Defendants intended to claim a tip credit and/or who were forced to participate in a tip pool with tip-ineligible workers, including supervisory employees.[8] *See* Carrera Decl., ECF 40-3, ¶¶ 19–22; Cheng Decl., ECF 40-4, ¶¶ 7–10; Valencia Decl., ECF 40-5, ¶¶ 8–11; Herard Decl., ECF 40-6, ¶¶ 6–9, in *Carrera*. Plaintiff Carrera names four WakuWaku workers with whom he had conversations regarding their concerns about Defendants' tip-pooling practices

---

[7] As Defendants point out, because Herard's declaration states that JTunes is not open in excess of 40 hours per week, its workers cannot have earned overtime compensation, and should be excluded from this collective. *See* Herard Opp'n, ECF 53, at 20–21 (citing Herard Decl., ECF 52-3, at ECF p. 8 n. 2), in *Herard*. The Court agrees.

[8] To the extent that Defendants restate their arguments regarding the evidentiary sufficiency of Carrera, Cheng, Valencia, and Herard's declarations — *i.e.*, that they are too generalized and conclusory to go beyond mere unsupported allegations — the Court finds that these arguments are without merit for the same reasons discussed above. *See* Carrera Opp'n, ECF 41, at 8–10, 14–19, in *Carrera*. Additionally, though Defendants object to "hearsay" assertions contained within these declarations specifically, the Court notes that "courts conducting the conditional certification inquiry 'regularly rely . . . on hearsay statements' contained in affidavits in establishing the necessary factual nexus between named plaintiffs and their coworkers." *Lijun Geng v. Shu Han Ju Rest. II Corp.*, No. 18-CV-12220 (PAE) (RWL), 2019 WL 4493429, at *10 (S.D.N.Y. Sept. 9, 2019) (quoting *Salomon v. Adderly Indus., Inc.*, 847 F. Supp. 2d 561, 563 (S.D.N.Y. 2012) (internal quotation marks omitted)).

at the restaurant. Carrera Decl., ECF 40-3, ¶¶ 19–20, in *Carrera*. Opt-in Plaintiff Valencia also identifies seven individuals who worked at Japan Village and Sunrise Mart Brooklyn and who, like her, "did not understand how their percentage of the tips was calculated, or why non-tipped employees were sharing in the tips." Valencia Decl., ECF 40-4, ¶ 11, in *Carrera*.

Herard, meanwhile, names nearly 30 individuals who worked at WakuWaku, Japan Village (including Panya and JTunes), Sunrise Mart Brooklyn, Sunrise Mart Midtown, and Sunrise Mart Soho with whom Herard spoke in the leadup to this lawsuit, who "confirmed that they were required to contribute their tips to a shared tip pool, which was then distributed in a manner that included employees who were not customarily and regularly tipped or they received tips from other pools." Herard Decl., ECF 40-6, ¶¶ 8–9, in *Carrera*.

Defendants argue that certification of the collectives of workers Plaintiffs request is inappropriate because "the putative collective members were subject to different policies." Carrera Opp'n, ECF 41, at 8–9, in *Carrera*. Specifically, they argue that "[r]ather than showing a common policy or plan, Plaintiffs have demonstrated different alleged practices across locations." *Id.* at 7. Plaintiffs respond that they are in fact seeking certification for separate collectives that correspond to the specific FLSA violations the workers experienced. *See* Reply, ECF 43, at 5–6, in *Carrera*.

For a court to authorize notice of a collective action to employees at multiple worksite locations, there must be "sufficient evidence that those employees were subject to the same allegedly unlawful policies." *Juarez*, 29 F. Supp. 3d at 370. A plaintiff's showing that defendants "share common ownership and treat employees, equipment, and supplies interchangeably" can support certification of a multi-worksite collective. *Lijun Geng*, 2019 WL 4493429, at *14 (collecting cases).

Here, Plaintiffs Carrera, Cheng, and Valencia state that, while working at WakuWaku and Sushi Uesugi, they were not paid minimum wage, not informed as to Defendants' intent to claim a tip credit, and forced to share their tips with tip-ineligible employees. The Court finds that these allegations are sufficient at this stage to establish a factual nexus between the respective situations of Plaintiff Carrera and other tipped workers "such that they are similarly situated victims of a common policy or plan that violated the law" as to workers at Defendants' locations where Plaintiffs aver that such practice occurred — *i.e.*, WakuWaku and Sushi Uesugi. *Chui*, 2020 WL 3618892, at *7 (quotation marks omitted); *see, e.g.*, *Juarez*, 29 F. Supp. 3d at 371 (S.D.N.Y. 2014); *see Trinidad*, 962 F. Supp. 2d at 558 (certifying a collective action as to six out of 33 of the defendants' stores where the plaintiffs had alleged a uniform practice of denying workers overtime across those locations). Similarly, Plaintiffs Cheng and Valencia state that they were forced to share their tips with supervisory employees while working across Japan Village and Sunrise Mart Brooklyn, and identify other employees who experienced the same violation of the FLSA; this, likewise, is sufficient to establish a factual nexus as to tipped employees at these locations.

Herard, in his capacity as a non-party witness to the *Carrera* action, states that, "based on [his] review of records pertaining to" tip pools at Sunrise Mart Midtown, Sunrise Mart Soho, Panya, and JTunes, as well as conversations he had with relevant employees, "tips received from customers were shared with workers who were not customarily and regularly tipped, including back-of-house kitchen and food preparation personnel and supervisory employees." Herard Decl., ECF 40-6, ¶ 13, in *Carrera*. He further identifies 12 employees of Sunrise Mart Midtown, Sunrise Mart Soho, Panya, and JTunes who "confirmed that they were required to contribute their tips to a shared tip pool, which was then distributed in a manner that included" non-tip

eligible and supervisory employees. *Id.* ¶¶ 8–9. This, too, supports the certification of a collective as to tipped workers at these locations.

On these facts, Plaintiffs have made the requisite "modest factual showing that they and potential opt-in plaintiffs" who worked at Defendants locations in the configurations above "together were victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555.

* * * * *

For these reasons, the Court finds that Plaintiffs have made the requisite "modest factual showing" necessary to be afforded the opportunity to send a notice to other (1) day rate employees who were not paid overtime earned, across all of Defendants' locations except JTunes (the "Certified Herard Collective"); (2) tipped WakuWaku/Sushi Uesugi employees who were paid a subminimum wage, not provided notice of Defendants' intent to take a tip credit, and were made to share tips with supervisory or otherwise non-tip eligible employees ("Certified Carrera Collective 1"); and (3) tipped Panya/JTunes/Sunrise Mart Brooklyn/Sunrise Mart Midtown/Sunrise Mart Soho employees who were made to share tips with supervisory or otherwise non-tip eligible employees ("Certified Carrera Collective 2") (together with Certified Carrera Collective 1, the "Carrera Collectives"). *See Gonzalez v. Wicked Taco LLC*, 764 F. Supp. 3d 77, 96 (E.D.N.Y. 2025) (certifying collective action as to two out of three of the defendants' locations), *reconsideration denied*, 772 F. Supp. 3d 284 (E.D.N.Y. 2025), *objections overruled*, 795 F. Supp. 3d 401 (E.D.N.Y. 2025).

**C. Notice of the Collective Action**

Once a court determines that the named plaintiffs and potential plaintiffs are similarly situated, it may exercise its discretion to authorize notice to all potential opt-in plaintiffs. *See Strain v. Sw. Airlines Co.*, No. 24-CV-8885 (SJB) (ST), 2026 WL 91842, at *6

(E.D.N.Y. Jan. 13, 2026); *see also Cooke v. Frank Brunckhorst Co., LLC*, 722 F. Supp. 3d 127, 141 (E.D.N.Y. 2024) ("Although § 216(b) does not expressly provide for court-authorized notice to potential opt-in plaintiffs in a collective action, it is well settled that district courts have the power to authorize an FLSA plaintiff to send such notice." (quotation marks omitted)), *granting reconsideration in part*, 734 F. Supp. 3d 206 (E.D.N.Y. 2024). Courts are vested with "broad discretion to craft appropriate notices that effectuate the overarching policies of the collective suit provisions and provide employees with accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hernandez v. Immortal Rise, Inc.*, No. 11-CV-4360 (RRM) (LB), 2012 WL 4369746, at *6 (E.D.N.Y. Sept. 24, 2012) (quotation marks omitted).

Having found that collective action certification is warranted at this stage, the Court authorizes that notice and consent forms be disseminated to potential collective members, subject to the requirements detailed below.

1. *Scope of Collectives & Notice Period*

Plaintiffs request that notice "be issued to similarly situated individuals employed by Defendants during the three-year period preceding the filing of the Complaint." Mem., ECF 52-1, at 12, in *Herard*; Mem., ECF 40-1, at 22, in *Carrera*. Defendants do not object to this request. *See generally* Herard Opp'n, ECF 53, in *Herard*; Carrera Opp'n, ECF 41, in *Carrera*.

The statute of limitations under the FLSA is generally two years, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). At the first stage of conditional certification, "allegations of willful conduct are sufficient to apply the three-year statute of limitations for purposes of certifying the class." *Agonath*, 2019 WL 1060627, at *4; *see*

*also Valerio v. R.N.C. Indus., LLC*, 314 F.R.D. 61, 73–74 (E.D.N.Y. 2016) (collecting cases). Here, Plaintiffs have alleged willful conduct in their respective amended complaints. *See* Am. Compl., ECF 21, ¶¶ 21, 99, 101, 118, 120, in *Herard*; Am. Compl., ECF 15, ¶¶ 58, 138, 142, 174–75, in *Carrera*. Accordingly, a three-year statute of limitations is appropriate at this stage.

"'[B]ecause equitable tolling issues often arise as to individual opt-in plaintiffs, courts frequently permit notice to be keyed to the three-year period prior to the filing of the complaint, with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date.'" *Valerio*, 314 F.R.D. at 74 (quoting *Gaspar v. Pers. Touch Moving, Inc.*, No. 13-CV-8187 (AJN), 2014 WL 4593944, at *7 (S.D.N.Y. Sept. 15, 2014) (internal quotation marks omitted)); *see also Yi Mei Ke v. JR Sushi 2 Inc.*, No. 19-CV-7332 (PAE) (BCM), 2021 WL 148751, at *14 (S.D.N.Y. Jan. 15, 2021) ("In this Circuit, courts routinely calculate the notice period from the date on which the lawsuit was filed (not the date of conditional certification)[.]" (quotation marks omitted)). Here, the Court concludes that "the remedial purposes of the FLSA are best served [] by applying the three-year statute of limitations from the date of the filing of the Complaint in this action." *Valerio*, 314 F.R.D. at 74 (quotation marks omitted). Accordingly, the Court directs that notice be provided to potential opt-in plaintiffs employed by Defendants:

(1) As day rate employees during the three (3) years preceding January 9, 2026, the date the *Herard* complaint was filed (as to the Herard Collective only); and

(2) As tipped employees during the three (3) years preceding February 12, 2026, the date the *Carrera* complaint was filed (as to the Carrera Collectives only).

2. *Opt-In Period*

Plaintiffs request that collective members be given 60 days to opt in. *See* Mem., ECF 52-1, at 12, in *Herard*; Mem., ECF 40-1, at 22, in *Carrera*. Defendants do not object to

this request. *See generally* Herard Opp'n, ECF 53, in *Herard*; Carrera Opp'n, ECF 41, in *Carrera*. Sixty-day opt-in periods are commonly approved, and the Court does so here. *See Han*, 2021 WL 3774186, at *13; *Chui*, 2020 WL 3618892, at *10.

3. *Contents of Notice*

Here, Plaintiffs have proposed content for these notices, to which Defendants raise several objections. Proposed Notice, ECF 52-4; *see* Herard Opp'n, ECF 53, at 18–21, in *Herard*; *see also* Proposed Notice, ECF 40-13; Carrera Opp'n, ECF 41, at 20–23, in *Carrera*. For the reasons set forth below, the Court adopts the content of Plaintiffs' proposed notices, in part, pursuant to certain modifications. The Court addresses the Defendants' objections to Plaintiffs' proposed notices in turn.

a. <u>*Herard*</u>

Defendants argue that "[i]n addition to employees who were paid a flat daily rate, Plaintiff's proposed notices are also directed at employees who were paid a flat weekly rate," which is improper because Plaintiff did not "include such employees in his collective action allegations in the FAC." Herard Opp'n, ECF 53, at 19–20 (citing Mem., ECF 52-1; Proposed Notice, ECF 52-4; Proposed Email, ECF 52-5; Proposed Text, ECF 52-6; Proposed Reminder, ECF 52-7), in *Herard*. Although the Court's review of the proposed notices does not indicate that these notices are directed at employees who were paid a flat weekly rate, the Court agrees with Defendants that weekly-rate employees are not properly members of the collective action. Accordingly, in an exercise of the Court's discretion and in an abundance of caution, any references in the notices to a "flat rate" should clarify that the operative rate is a daily or day rate.

Defendants further contend that the notice's opening statement should clarify that it is directed at employees who were paid a flat daily rate and not paid overtime when they worked over 40 hours in a given workweek, since that is the putative FLSA

violation at issue. *Id.* at 20. Similarly, Defendants object to the inclusion of JTunes in the notice, because those workers were not owed any overtime compensation due to JTunes' hours of operation. *Id.*; *see supra* note 7. The Court agrees, and directs Plaintiffs to modify the notice accordingly.

Finally, Defendants object to the inclusion of any reference to Defendants' tipping practices since they are not the subject of the *Herard* action, and argue that "the notice should remove any reference to claims under the New York Labor Law or claims not being pursued collectively." Herard Opp'n, ECF 53, at 21, in *Herard*. The Court agrees. The notice should not state or imply that the collective covers alleged NYLL violations or tip-pooling violations under the FLSA.

The above modifications should be made to Plaintiffs' proposed email, text, and reminder messages, as necessary. *See* Proposed Notice, ECF 52-4; Proposed Email, ECF 52-5; Proposed Text, ECF 52-6; Proposed Reminder, ECF 52-7, in *Herard*.

In addition, the Court directs counsel to make the following edits:

- Proposed Notice, ECF 52-4, at ECF p. 2: "However, you do not give up your right to bring your own, action" should be amended to read: "However, you do not give up your right to bring your own action."
- *Id.* at ECF p. 4: "Your immigration status **does** not affect your entitlement . . ." should be amended to read: "Your immigration status **does not** affect your entitlement . . . ."
- *Id.* at ECF p. 6: "(2) 40% of the gross settlement or judgment amount" should be amended to read: "(2) up to 40% of the gross settlement or judgment amount, subject to approval by the Court."
- Proposed Email, ECF 52-5: ". . . overtime premiums for all hours worked over 40" should include, "in one or more specific workweeks."
- Proposed Reminder, ECF 52-7: Insert, "and not compensated at an overtime rate for hours worked over 40 in one or more specific workweeks," after "If you were compensated on a 'day rate' basis."

b. <u>*Carrera*</u>

Defendants request that the notice provide "a neutral statement of the claims and Defendants' answer, without any indication of the future outcome of the case." Mem.,

ECF 41, at 22–23; *see* Proposed Notice, ECF 40-13, at ECF pp. 2–3, in *Carrera*. Because Defendants do not elaborate the basis for their belief that Plaintiffs' proposed language is not neutral, and the Court does not read it to indicate the future outcome of the case, the Court declines to adopt Defendants' proposed language. Additionally, Defendants' request that all references to the NYLL be omitted since those claims cannot be pursued collectively is granted, for the same reasons stated above. Appropriate parallel modifications should be made to Plaintiffs' proposed email, text message, and reminder messages.[9]

In addition, the Court directs counsel to make the following edits:

- Proposed Notice, ECF 40-13, at ECF p. 5: "Your immigration status **does** not affect your entitlement . . ." should be amended to read: "Your immigration status **does not** affect your entitlement . . . ."
- *Id.* at ECF p. 7: "(2) 40% of the gross settlement or judgment amount" should be amended to read: "(2) up to 40% of the gross settlement or judgment amount, subject to approval by the Court."
- Proposed Email, ECF 40-14: Specify that "unpaid minimum wages and overtime compensation" is limited to workers who worked at WakuWaku.
- Proposed Text Message, ECF 44-2, and Proposed Reminder, ECF 44-3: Add a reference to JTunes.

c. *Herard & Carrera*

Across both lawsuits, Plaintiffs request that in addition to English, the notices and consent forms be translated into Spanish and Japanese, to which Defendants do not object. *See* Mem., ECF 52-1, at 12; *see generally* Herard Opp'n, ECF 53, in *Herard*; *see also* Mem., ECF 40-1, at 22; *see also generally* Carrera Opp'n, ECF 41, in *Carrera*. Given that it

---

[9] Defendants object to the proposed text message and reminder notice because "Plaintiffs have not shared a copy of these proposed documents with Defendants." Carrera Opp'n, ECF 41, at 21, in *Carrera*. Defendants withdrew their objection on this basis, however, once Plaintiffs' counsel served Defendants with the omitted requests. Rooney Suppl. Opp'n Decl., ECF 42-2, ¶¶ 5–6, in *Carrera*.

promotes the remedial purposes of the FLSA to permit notice to be "translated into the mother tongue of non-English speaking groups of potential plaintiffs," the Court authorizes Plaintiffs to circulate the notices in English, Spanish, and Japanese. *Colon*, 2013 WL 3328223, at *8. The Court further directs Plaintiffs to provide Defendants with a copy of the Spanish and Japanese translations of the revised notice pursuant to the timeline outlined below.

Defendants request that their counsel's contact information be included in the proposed notices "to mitigate any impression that the Court may be endorsing Plaintiff's counsel and/or position over Defendants'." Mem., ECF 53, at 21–22, in *Herard*; *see* Mem., ECF 41, at 23, in *Carrera*. Plaintiffs argue that defense counsel's information should not be included because it is likely to confuse potential opt-ins, but if it is included, that it should be accompanied by emphasized and/or bolded language instructing Plaintiffs not to contact defense counsel. Reply, ECF 55, at 7 & n.7, in *Herard*; *see* Reply, ECF 43, at 9–10, in *Carrera*. Courts in this circuit routinely find that defense counsel's information should not be included on a FLSA collective action opt-in notice because it is "'likely to create confusion rendering distribution or collection of consent to join forms less effective.'" *Yuan v. AA Forest Inc.*, No. 20-CV-5484 (AMD) (MMH), 2025 WL 2779284, at *10 (E.D.N.Y. Sept. 30, 2025) (quoting *Arciello v. County of Nassau*, No. 16-CV-3974 (ADS) (SIL), 2017 WL 4998074, at *7 (E.D.N.Y. Oct. 30, 2017)); *see Ding*, 347 F.R.D. at 434; *Chabb*, 2013 WL 5308004, at *16. Accordingly, the notice need not include contact information for defense counsel.

Finally, the notices in both lawsuits direct potential opt-in plaintiffs to return the consent form to Plaintiffs' counsel. *See* Proposed Notice, ECF 52-4, at ECF pp. 4, 6, in *Herard*; Proposed Notice, ECF 40-13, at ECF p. 5, 7, in *Carrera*. Defendants object to this language and request that the Court order the consent forms to be sent directly to the

Clerk of Court. Herard Opp'n, ECF 53, at 21, in *Herard*; Carrera Opp'n, ECF 41, at 23, in *Carrera*. Because "[t]he common practice in the Eastern District is to have opt-in plaintiffs send their consent forms to the Clerk of the Court rather than to plaintiffs' counsel," the Court adopts this measure here as well, but only in part. *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 462 (E.D.N.Y. 2014); *see also Jing Fang Luo*, 2016 WL 11263668, at *15 (collecting cases). The notices must state that potential opt-in plaintiffs should mail physical consent forms to the Clerk of the Court and include the court's mailing address; should Plaintiffs' law firm decide to include pre-addressed return envelopes along with the mailing, they should be addressed to the Court at 225 Cadman Plaza East, Brooklyn NY, 11201.[10] In light of this modification, Plaintiffs are directed to strike the language, "Please do not write or call the Court about this Notice" from the notices, as such language may confuse potential opt-in plaintiffs.

Notwithstanding these directives, Plaintiffs' request that potential opt-in plaintiffs be allowed to execute the consent form electronically is granted. *See* Mem., ECF 52-1, at 12, in *Herard*; Carrera Mem., ECF 40-1, at 22, in *Carrera*. Accordingly, potential opt-in plaintiffs may sign the consent form electronically (*i.e.*, via digital signature), and may return electronic versions of the executed consent forms via email or electronic fax to Plaintiffs' counsel, who shall then promptly docket the executed consent forms via ECF. Should any potential opt-in Plaintiffs return physical opt-in forms to Plaintiffs' counsel, rather than the Court, Plaintiffs' counsel is directed to promptly docket these forms via ECF as well.

[10] This method will still enable Plaintiffs' counsel to receive notice of opt-in plaintiffs' joining in the lawsuit, as filing with the Clerk of the Court will "cause the Consents to be docketed into the ECF system and thus served on all counsel of record." *See Lujan v. Cabana Mgmt.*, No. 10-CV-0755 (ILG), 2011 WL 317984, at *13 (E.D.N.Y. Feb. 1, 2011).

*4. Distribution of the Notices & Consent Forms*

Plaintiffs wish to disseminate the notices and consent forms by first-class mail, email, and text message, including a reminder message sent at the midpoint of the opt-in period, and by directing Defendants to post them "in conspicuous locations within each of the Defendant entities." Mem., ECF 52-1, at 11, in *Herard*; *see* Mem., ECF 40-1, at 21, in *Carrera*. Defendants object to distribution of the notices and consent forms by email and text and to posting them within their locations as "unnecessary [and] duplicative" and because they "would be a distraction in the workplace." Herard Opp'n, ECF 53, at 18–19, in *Herard*; *see* Carrera Opp'n, ECF 41, at 20–22, in *Carrera*. For the following reasons, the Court approves Plaintiffs' proposed distribution methods.

First, dissemination of the notices by mail, email, and text message, as well as with a reminder message, is approved. Courts regularly find that the dissemination via these channels is acceptable. *See Ding v. Mask Pot Inc.*, 347 F.R.D. 417, 431 (E.D.N.Y. 2024) (collecting cases); *see also Panora v. Deenora Corp.*, No. 19-CV-7267 (BMC), 2020 WL 7246439, at *5 (E.D.N.Y. Dec. 9, 2020). Against this background, Defendants' unsupported assertion that text message dissemination "is intrusive and an invasion of privacy" is unavailing. Herard Opp'n, ECF 53, at 18, in *Herard*.

Second, posting the notice at Defendants' physical business locations is a generally acceptable form of distributing information related to such notices, and is therefore approved. *Chen v. Thai Greenleaf Rest. Corp.*, No. 21-CV-1382 (MKB) (JMW), 2024 WL 3742718, at *8 (E.D.N.Y. Aug. 9, 2024) (observing that "[c]ourts in this Circuit consistently allow plaintiffs to post notices in conspicuous locations in defendant's workplaces . . . to maximize the opportunity for potential opt-in members to join the lawsuit" and collecting cases). Defendants are therefore directed to post the notices and consent forms in appropriate, conspicuous locations of their businesses for 60 days;

within one week of the end of the opt-in period, Defendants are directed to file a declaration via ECF certifying that the notices and consent forms were posted in such locations for the duration of the opt-in period.

5. *Expedited Disclosure of Identifying Information*

To facilitate notice of the lawsuits, Plaintiffs request that the Court order Defendants to produce "a computer-readable file for each relevant location identifying potential opt-in plaintiffs' names, last known mailing addresses, personal email addresses, home and mobile telephone numbers, dates of employment, job titles, primary language(s), and work location(s)" within 14 days of the Court's order. Mem., ECF 52-1, at 13, in *Herard*; Mem., ECF 40-1, at 22–24, in *Carrera*. Defendants oppose this request, arguing that "it is overly broad and a breach of privacy," and positing that "only disclosure of employees' basic contact information, *i.e.*, name and physical address, is appropriate." Herard Opp'n, ECF 53, at 17–18, in *Herard*; *see* Carrera Opp'n, ECF 41, at 19–20, in *Carrera*. "In general, it is appropriate for courts in collective actions to order the discovery of names, addresses, telephone numbers, email addresses, and dates of employment of potential collective members." *Taveras v. PSD Freeport Inc.*, No. 19-CV-6243 (MKB) (RER), 2021 WL 1405994, at *7 (E.D.N.Y. Apr. 14, 2021) (quoting *Valerio*, 314 F.R.D. at 74–75). In this case, production of potential collective members' primary language(s) is also necessary "[t]o facilitate successful notification." *Cruz-Pena v. Great Kitchen Support Corp.*, No. 24-CV-6263 (PKC) (RML), 2025 WL 2108542, at *5 (E.D.N.Y. July 28, 2025) (collecting cases directing production of opt-in plaintiffs' primary languages). Additionally, the Court does not find that disclosure of employees' work locations is overbroad or would breach employees' privacy. *See Ding*, 347 F.R.D. at 437 (ordering the defendant to produce work location(s)). Accordingly, Defendants

are directed to produce the above information in a computer-readable format within 14 days of this Order.

* * * * *

The Court approves the contents of the proposed notice, save for the modifications described above. Once Plaintiffs have edited the notices and consent to sue forms to reflect the requirements above, Plaintiffs shall serve the revised drafts (in English, Spanish, and Japanese) on Defendants by October 16, 2026, and by October 30, 2026, Defendants shall serve any objections or give their consent. By November 13, 2026, the parties shall file a motion for Court approval, which must include final versions of the notice forms. Within two weeks of the Court's approval of the final version of the notices, Plaintiffs shall distribute the notices and Defendants shall post them at one or more conspicuous locations at each relevant workplace (*e.g.*, by time clocks, employee entrances, break areas, locker rooms, or other areas customarily accessed by potential collective members), and maintain the postings throughout the opt-in period. Finally, all opt-in consent forms must be filed with the Clerk of the Court within sixty (60) days from the date the Court approves the final notice form.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motions for conditional certification as a collective action under the FLSA pursuant to 29 U.S.C. § 216(b) are granted in part and denied in part, subject to the limitations discussed in this Memorandum and Order.

The Court further orders that:

(1) within fourteen (14) days of this Order, by October 16, 2026, Plaintiffs shall serve the revised drafts (in English, Spanish, and Japanese) on Defendants, and by October 30, 2026, Defendants shall serve any objections or give their consent. By

November 13, 2026, the parties shall file a joint motion for Court approval, which must include the final version of the notices and consent to sue form;

(2) within fourteen (14) days of this Order, by October 16, 2026, Defendants are to produce to Plaintiffs a computer-readable file for each relevant location identifying potential opt-in plaintiffs' names, last known mailing addresses, personal email addresses, home and mobile telephone numbers, dates of employment, job titles, primary language(s), and work location(s);

(3) within fourteen (14) days of final approval by the Court, Plaintiffs Herard and Carrera shall disseminate a copy of their respective lawsuits' approved Notice and consent to sue forms to the putative collectives;

(4) within fourteen (14) days of final approval by the Court, Defendants shall post a copy or copies of the approved Notice and consent to sue forms at one or more conspicuous locations at the relevant worksites;

(5) no sooner than thirty (30) days following final approval by the Court, Plaintiffs may send one reminder notice by mail and email to notify potential opt-in Plaintiffs that the sixty (60) day opt-in period is coming to a close; and

(6) within one week of the completion of the sixty (60) day opt-in period, Defendants shall file a declaration via ECF, certifying that the notice and consent forms were posted in appropriate, conspicuous locations of their businesses for the duration of the opt-in period.

**SO ORDERED.**

Dated: Brooklyn, New York
October 2, 2026

Taryn A. Merkl
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE